CRAIG KRICHMAR, an Infant, by ROSE KRICHMAR, His Guardian ad Litem, Respondent, v JOSEPH KRICHMAR et al., Appellants.

Second Department, July 7, 1975

*J. Robert Morris (Joseph D. Ahearn* of counsel), for appellants.

*Finley, Kumble, Heine, Underberg & Grutman (Alan M. Gelb, Jewel H. Bjork* and *Wallace Gossett* of counsel), for respondent.

SHAPIRO, J. The question for decision is whether under the circumstances of this case the infant plaintiff can sue his parents, the defendants, to recover damages for personal injuries sustained by him through their alleged negligence in the operation of an automobile in which he was a passenger, after having settled with, and given a general release to, the owner and operator of the other offending vehicle, a truck. We affirm the order of the Special Term which, in effect, held that he could.

### THE FACTS AND PRIOR PROCEEDINGS.

On the afternoon of October 27, 1966, Craig Krichmar, the infant plaintiff, was a passenger in an automobile owned by his father, Joseph Krichmar, and driven by his mother, Rita Krichmar, when it collided with a dump truck owned by Anthony Piazza and driven by Anthony Passafuime. As a result of the accident, Craig and his mother were both injured and hospitalized. In August, 1967 the father, individually and as natural guardian of his son Craig, joined by his mother Rita, sued Piazza and Passafuime in negligence. Craig's claim was settled for $40,000 with the approval of the court. Justice FITZPATRICK's order of May 16, 1968, approving the settlement of the infant's claim, provided in part: "Ordered, that Joseph Krichmar, as father and natural guardian of Craig Krichmar, infant plaintiff, be and he hereby is authorized to enter into and accept a compromise of the claims herein, the claim for loss of services on behalf of Joseph Krichmar having been waived, upon compliance with the following terms of this order, to wit: that the defendant pay the sum of Forty Thousand ($40,000.) Dollars in full settlement of the claims of the infant plaintiff and the father and natural guardian herein".

In connection with the settlement, and although not specifically required by the order of compromise, a general release, dated May 16, 1968, was given to the defendants Piazza and

Passafuime. Thereafter, in March, 1969, the Court of Appeals handed down its decision in *Gelbman v Gelbman* (23 NY2d 434).[1] By notice of motion dated June 11, 1970, the plaintiffs in the original action, Craig Krichmar, the infant, by his father and natural guardian Joseph Krichmar, and Rita Krichmar and Joseph Krichmar, individually, applied to Justice FITZPATRICK to reform and resettle the earlier order of compromise. On August 26, 1970 Justice FITZPATRICK modified the order of compromise of May 16, 1968 to state that the 1968 settlement and compromise "is without prejudice to any right of the infant plaintiff, Craig Krichmar, to seek recovery against any other person or persons, other than the defendants named in this action [Piazza and Passafuime], who may be liable to him for the injuries sustained by him in the accident of October 27, 1966."[2]

On July 11, 1972, the Special Term appointed the infant plaintiff's grandmother, Rose Krichmar, as his guardian ad litem "for the purpose of instituting and prosecuting an action on behalf of the said infant, against Joseph Krichmar and Rita Krichmar", his parents. This action against them was commenced on September 21, 1972. Issue was joined by service of the defendants' answer on December 14, 1972. The answer contained general denials and affirmative defenses of Statute of Limitations and general release, plus a partial defense in mitigation of damages by payment by the defendants' insurer of $2,000 for the plaintiff's hospital and medical expenses.

By notice of motion dated September 5, 1973, renewed on February 12, 1974, the defendants moved for leave to serve an amended answer to reflect that the figure paid the infant plaintiff in settlement of the prior action was $40,000 rather than $2,000, and to assert two partial defenses in mitigation of

---

1. *Gelbman* was a suit by a parent against her 16-year-old son for injuries she suffered when an automobile driven by him, in which she was a passenger, collided with another vehicle. Under the law in effect when she brought her suit, a court-created doctrine of intrafamilial tort immunity barred her action *(Badigian v Badigian,* 9 NY2d 472). But, in *Gelbman* (pp 437–438) the Court of Appeals abolished the doctrine of intrafamilial tort immunity, adopting "the convincing arguments advanced by Judge FULD in his comprehensive dissent in *Badigian"* *(Lastowski v Norge Coin-O-Matic,* 44 AD2d 127, 131; see, also, *Holodook v Spencer,* 36 NY2d 35, 43). In abolishing the immunity defense, *Gelbman* allows suits between parents and children which would previously have been actionable between the parties absent the family relationship.

2. This order made it crystal clear that Special Term, in approving the original settlement, never intended to authorize a release of the parents or to prevent a suit against them.

damages, one for $40,000, the sum paid by Piazza and Passa-fuime, in exchange for the general release, and the other for the $2,000 paid by the parents' insurer for the medical expenses incurred by the parents on behalf of the infant plaintiff.

The plaintiff cross-moved on March 8, 1974 for an order dismissing the affirmative defenses as without merit.

### THE ORDER APPEALED FROM AND THE OPINION OF SPECIAL TERM.

The Special Term granted the plaintiff's cross motion to strike the defenses of Statute of Limitations and general release and granted the defendants' motion to allow them to plead the payments of $40,000 and $2,000 in mitigation of damages. In its opinion, the Special Term declared the defense of Statute of Limitations to be insufficient since CPLR 208 permits an action on behalf of an infant to be commenced at any time during the infant's minority or during a three-year period following his 21st birthday. We agree with that disposition.

In rejecting the defense of general release, the Special Term declared that the rule that a general release without reservation applied to all tort-feasors liable for the same injury *(Kainz v Goldsmith,* 231 App Div 171) could not have been intended to release the defendant parents because, in 1968 when the release was delivered, their infant son had no cognizable cause of action against them.

### THE LAW

Prior to the adoption of section 15-108 of the General Obligations Law,[3] it was unquestionable that a "general re-

---

3. This section was added by the Laws of 1972 (ch 830, § 3). Subdivision (a) of that section provides: "(a) Effect of release of or covenant not to sue tortfeasors. When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest." According to the Supplementary Practice Commentary in the Cumulative Pocket Part of Book 2⌄A, 1974-1975, of McKinney's Consolidated Laws of New York, p 120, this section was "designed to assure a plaintiff that he may settle his claim with one of several tortfeasors without prejudicing his right to pursue the other tortfeasors."

lease to one tort feasor made without reservation creates a bar to an action for damages against another tort feasor, arising from the same injury" (*Milks v McIver*, 264 NY 267, 269). However, "although the effect of a general release, in the absence of fraud or mutual mistake, cannot be limited or curtailed (see *Lucio v Curran*, 2 NY2d 157, 161; *Kirchner v New Home Sewing Mach. Co.*, 135 NY 182, 188), its meaning and coverage necessarily depend, as in the case of contracts generally, upon the controversy being settled *and upon the purpose for which the release was actually given. Certainly, a release may not be read to cover matters which the parties did not desire or intend to dispose of*" (*Cahill v Regan*, 5 NY2d 292, 299 [emphasis supplied]).

Here, where the governing case law at the time the release was signed by the infant plaintiff's natural guardian precluded any recovery against his parents, a fact which was known to the court which approved the settlement and which presumably was known to his parents' counsel and insurer, it would seem obvious that neither the parents (protected by liability insurance) nor the court desired or intended to dispose of any then nonenforceable claim by the infant against his mother, the driver of the vehicle in which he was riding, or against his father, the owner of that vehicle.

In *Metropolitan Dry Cleaning Mach. Co. v Hirsch* (38 AD2d 558, 559), this court said: "The principle underlying the rule of *Milks v McIver* (264 NY 267, *supra*), that a release of one joint tort-feasor releases all, absent a reservation to the contrary, is founded on the equitable notion that the law will not permit a double recovery." Here, a double recovery is impossible, since, in order to recover from the instant defendants, his parents, the infant plaintiff must establish damages in excess of the $40,000 paid to him by the other joint tort-feasors. Thus there is here absent the danger that led this court in *Metropolitan Dry Cleaning Mach.* (*supra,* p 560) to say that it would "not permit a plaintiff to indulge in 'the niceties of legal theory' to avoid the effect of a general release and obtain a second recovery". Since the defendants will be credited with what the plaintiff has already received in mitigation of damages, and as the $40,000 heretofore paid will effectually bar a recovery in this action if the infant plaintiff's damages are equal to or less than that sum, there is no danger that he may "obtain a second recovery".

The appellants contend, however, that the release given to

the other tort-feasors relieves them of any liability because *Gelbman* "did not create any new liability" on their part, since the court there said: "By abolishing the defense of intrafamily tort immunity for nonwillful torts, we are not creating liability where none previously existed. Rather, we are permitting recovery, previously denied, after the liability has been established. We, therefore, conclude that the present decision should be applied retrospectively to matters which have not gone to final judgment" *(Gelbman v Gelbman,* 23 NY2d 434, 439, *supra).* The appellants misconstrue the meaning of that quotation as applied to the facts here. Read in the context of the record before us, that language stands for the propositions (1) that thereafter recovery was to be permitted for intrafamilial tort, but, as in any other suit for tort injury, only where the injured family member could establish a case of negligence and consequent liability on the part of the other family member and (2) that the elimination of the defense of intrafamily tort immunity for nonwillful torts in no way altered or lessened the burden on the plaintiff to prove that the negligence of the family member tort-feasor was a cause of the injury. The language was also clearly intended to stress that where the plaintiff could establish this, even in cases where the tort was committed prior to the court's ruling, he could nevertheless recover if he had not, prior thereto, carried through *to judgment* his action for damages. In other words, since *Gelbman* created no special standards of care as between family members, but simply removed the judicially created ban on recovery under existing general standards of negligence, there was no reason why a plaintiff injured by the nonwillful tort of a family member should not recover if he were not barred by a prior judgment.

In their dissent, my learned colleagues rely upon the provisions of CPLR 1207, which state that an order of compromise in an infant's action "shall have the effect of a judgment." However, they completely disregard the resettled order of compromise—made on notice to all parties to that action, which by its terms determined that the settlement "is without prejudice to any right of the infant plaintiff, Craig Krichmar, to seek recovery against any other person or persons, other than the defendants named in this action, who may be liable to him for the injuries sustained by him in the accident of October 27, 1966"—by saying that it is without binding force and effect because no notice was given to the insurance

carrier of the parents (the presumed defendants). The logic of that contention escapes me. If, in the first place, the court had authorized a settlement of the infant's cause of action against Piazza and Passafuime "without prejudice", it is certain that this reservation would have been valid without giving notice to any other joint tort-feasors or to their insurance carrier. I cannot see why the court could not do by way of modification upon *notice* to all of the parties in the action there compromised what it could have done originally.

Another factor which supports the propriety of granting the motion to dismiss the defense of general release is alluded to in *Gelbman.* There Judge BURKE noted: "The parties recognize, as we must, that there is compulsory automobile insurance in New York. Such insurance effectively removes the argument favoring continued family harmony as a basis for prohibiting this suit. The present litigation is, in reality, between the parent passenger and her insurance carrier. Viewing the case in this light, we are unable to comprehend how the family harmony will be enhanced by prohibiting this suit" *(Gelbman v Gelbman,* 23 NY2d 434, 438, *supra).* Here, the present litigation is, in reality, between the infant passenger and his parents' insurance carrier. It is clear, therefore, that family harmony will be enhanced by allowing this suit rather than by rejecting it. By limiting the applicability of the common-law general release doctrine under the fact pattern here, we give living effect to the declaration in *Gelbman* (p 439) that "The definite and vital interest of society in protecting people from losses resulting from accidents should remain paramount. (See James, Accident Liability Reconsidered: The Impact of Liability Insurance, 57 Yale L.J. 549)."

The infant plaintiff here was clearly helpless to attack the doctrine of intrafamilial tort immunity later struck down in *Gelbman,* since he was at all times represented by his father acting in his capacity as his son's natural guardian. Under those circumstances, to now hold that when the father delivered a general release to Piazza and Passafuime for the purpose of evidencing *their* release from further liability for the accident in which his son was injured *he thereby automatically released himself from all liability for that accident* is looking at the facts through the wrong end of the telescope. The interpretation which is thus contended for by the dissenters pays obeisance to the release rule in its general application without giving heed to the fact that, by thus doing, they

are permitting the father to urge as a defense, not a release which he received, but a release which he executed and delivered to others to release them.

The order should therefore be affirmed insofar as it is appealed from, with $20 costs and disbursements.

COHALAN and MUNDER, JJ. (concurring in part and dissenting in part). We vote to affirm that portion of the order which dismissed the affirmative defense of Statute of Limitations, *but* otherwise dissent and vote to reverse that portion of the order appealed from which refused to permit the interposition of the affirmative defense of general release.

In 1966, the plaintiff, who was then 10 years of age, was a passenger in an automobile operated by his mother and owned by his absent father. The car collided with a truck at an uncontrolled intersection in Queens County. The Krichmar car was on the right, and, all things being equal, had the legal right of way.

Both the mother and the child were injured. A suit which was commenced against the owner and the operator of the truck was settled in 1968. Mrs. Krichmar received $20,000 and the plaintiff $40,000, importing a $50,000/$100,000 insurance policy. Medical and hospital bills to the extent of $2,000 were also paid on behalf of the infant and his mother by the parents' insurance carrier.

The infant plaintiff was seriously injured. He suffered, among other complaints, a fractured skull. The consequences cf his injury were known, or should have been known, to the parents at the time of the settlement, inasmuch as they had the services of a qualified neurologist for their son from the very date of the accident.

On May 16, 1968, a compromise order settling the infant's claim was signed at the Special Term. A general release running from the Krichmar adults, on behalf of the infant, was duly executed and delivered to effectuate the settlement. There was no reservation of rights in the general release. At that time the release of one joint tort-feasor acted as a discharge of all others allegedly liable for the same injuries (*Milks v McIver,* 264 NY 267; *Metropolitan Dry Cleaning Mach. Co. v Hirsch,* 38 AD2d 558; *Williams v Pitts,* 40 AD2d 1057). Since then, effective September 1, 1972, section 15-108 of the General Obligations Law has changed that rule, but it

is not retrospective in its application *(Jordan v Westhill Cent. School Dist.,* 42 AD2d 1043).

Prior to 1969, an unemancipated child could not successfully sue a parent for nonwillful tort (see *Sorrentino v Sorrentino,* 248 NY 626; *Cannon v Cannon,* 287 NY 425; *Badigian v Badigian,* 9 NY2d 472). In that year, *Gelbman v Gelbman* (23 NY2d 434) abolished this immunity. The court there said (p 439): "By abolishing the defense of intrafamily tort immunity for nonwillful torts, we are not creating liability where none previously existed. Rather, we are permitting recovery, previously denied, after the liability has been established. We, therefore, conclude that the present decision should be applied retrospectively to matters which have not gone to final judgment".

CPLR 1207 makes provision for the settlement of infants' claims. So far as is here pertinent, it reads: "Upon motion of a * * * parent having legal custody of an infant * * * the court may order settlement of any action commenced by or on behalf of the infant * * *. An order on such a motion shall have the effect of a judgment."

CPLR 105 (subd [k]) defines the word "judgment" as: "Judgment. The word 'judgment' means a final or interlocutory judgment" (see, also, CPLR 5011).

Obviously, when the order of compromise was issued, it was meant to be a "final" and not an "interlocutory" judgment. Therefore, under the holding in *Gelbman (supra),* the order of compromise, coupled with the absolute general release, constituted a final judgment.

Despite the finality of the settlement and general release given to the trucking company and its driver, the infant, by attorneys retained by his father, successfully petitioned the Special Term for an order of modification, which order was signed on August 26, 1970. The effect of the order was to permit the infant plaintiff to open up his case so that he could sue both his parents for further recovery beyond the amounts already paid to him.

Thereafter, and on July 11, 1972, Rose Krichmar, the paternal grandmother of the infant, on the application of the same attorneys, was appointed guardian ad litem in order to prosecute the current suit.

The *Gelbman* case did not spring, as did Minerva, fully armed, from the head of Jupiter. Rather, it was reached by a

process of erosion. In *Sorrentino (supra)*, a 4-3 decision sustained the now discarded theory, with CARDOZO, Ch. J., CRANE and ANDREWS, JJ., in dissent, no opinion having been written by either side. But in *Badigian (supra)*, the powerful dissent of Judge FULD foreshadowed the conception, gestation and birth of *Gelbman* as an idea whose time had come. It might just as well have arrived legitimately in the instant case, rather than in the questionable manner in which it has reached this court.

At bar it is of interest to note that when the application to modify the original order of compromise was made, notice was given only to the trucking company and its driver, to both of whom a general release had been given two years before. They no longer had any interest in the case and so defaulted. Yet, in *Gelbman,* the court made the observation (p 438) that: "The present litigation is, in reality, between the parent passenger and her insurance carrier."

Substitute the words "infant passenger" and it is our case. However, no attempt was made to alert the insurance carrier to the modification application. It is thus manifestly unfair to say that it defaulted and that the law of the case had been established, thus estopping it from attacking the modification order of August, 1970.

For the reasons stated, we think the defendants should be permitted to plead the affirmative defense of general release as a bar to the action.

HOPKINS, Acting P. J., and BRENNAN, J., concur with SHAPIRO, J.; COHALAN and MUNDER, JJ., concur as to the striking of the defense of Statute of Limitations, but otherwise dissent and vote to sustain the defense of general release, with an opinion.

Order of the Supreme Court, Rockland County, dated May 20, 1974, affirmed insofar as appealed from, with $20 costs and disbursements.