Fuchsberg, J.
(concurring). My concurrence here is in result only.
In Gelbman v Gelbman (23 NY2d 434), building on Judge Fuld’s memorable dissent in Badigian v Badigian (9 NY2d 472), this court unqualifiedly and unanimously revoked a rule of this State which theretofore had prohibited child-parent suits for nonwillful torts. The historical, social and legal exigeses that supported those opinions were too clearly stated then to require repetition here.* Yet, though nothing had occurred in the interim to substantiate the alarums of those who decried Gelbman, only seven years later, in Holodook v Spencer (36 NY2d 35), a divided court cut back on that holding when it decided to restore the immunity doctrine it had previously discarded for cases in which the tort committed by a parent against his child occurs in a factual framework that can be associated with parental supervision. And, though every one of our sister States that have considered the problem has rejected the Holodook rule (e.g., Gibson v Gibson, 3 Cal 3d 914; Goller v White, 20 Wis 2d 402; Silesky v Kelman, 281 Minn 431), though the critical analysis in Judge Jasen’s dissenting opinion in Holodook is supported by eminent scholarly authority (see McCurdy, Torts Between Persons in Domestic Relation, 43 Harv L Rev 1030, 1078-1080; Thuillez, Parental Nonsupervision: The Tort that Never Was, 40 Albany L Rev 336; Casenote, 42 Brooklyn L Rev 125; Note, 47 U Col L Rev 795), and though the majority of the court today seeks some escape from Holodook’s strictures, I find it regrettable that the court should tinker with rather than toss out the so-called negligent supervision exception.
Thus, to meet the need for a just result, one of my colleagues, despite Holodook, would carve out a further complicating subexception for parental behavior which, though supervisory in nature, could be characterized as wanton or gross negligence. Another member of the court, seeking a like objective, would, I respectfully suggest, stretch the principles *346 of foreseeability and proximate cause beyond all recognition by placing on the parent here the responsibility not only to anticipate that an unknown party may suffer damage as a consequence of the parental negligence in entrusting a child handicapped by severely impaired vision with the operation of a motorcycle, a reasonably anticipatable result, but also to foresee that the unknown party in some unknown manner will have contributed to the accident by concurrent negligence on its part, a completely speculative and remote contingency for which no statistical or other basis exists, and, even beyond that, that the unknown party will be subjected to suit and will seek contribution from the erring parent (see Ventricelli v Kinney System Rent A Car, 45 NY2d 950; see, also, Sheehan v City of New York, 40 NY2d 496; Prosser, Torts [4th ed], § 43, pp 267-270).
Instead of either of these solutions to the dilemmas Holodook has created, I would return to the simple and fundamental principles enunciated in Gelbman and in the Badigian and Holodook dissents, which in effect would permit each parent-child case to be decided by answering the broad question at the heart of negligence law: What would an ordinarily reasonable and prudent person — taking into account the parent-child relationship — have done in similar circumstances? (Cf. Gibson v Gibson, 3 Cal 3d 914, 921-922.) In doing so, I do not ignore the values inherent in stare decisis, but regard this as an appropriate instance for the application of the balancing principle of which Mr. Justice Frankfurter spoke when he pointed out that "stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience” (emphasis mine) (Helvering v Hallock, 309 US 106, 119, quoted in People v Hobson, 39 NY2d 479, 487).
A standard of "reasonable care under the circumstances”, well understood in tort law and only recently reaffirmed by this court in a conceptually related context (see Quinlan v Cecchini, 41 NY2d 686; Basso v Miller, 40 NY2d 233, 241; Scurti v City of of New York, 40 NY2d 433, 437), would not require that a parent live up to some idealized picture of a model father or mother. A mere misjudgment in supervising one’s child would not necessarily constitute a tortious breach of duty. In determining whether the bounds of reasonable *347 behavior have been transgressed, all of the relevant facts and circumstances would have to be considered. In a supervision situation, among the foremost are bound to be the existence of the relation of parent and child; the practical responsibilities, expectations and limitations that flow therefrom; and the judgmental nature of the decisions a parent must make in functioning in that capacity.
Without developing this point in extenso, the weight which a court or jury will ascribe to each of these and other related factors will depend on the facts peculiar to the particular case. For example, aside from the facts relating to the negligence itself, such variable matters as the age, mental and physical health, intelligence, aptitudes and needs of the child involved; the presence in the family of other children competing for parental time and attention; and the economic social and physical environment in which the parental conduct occurs, all may be expected to play a part.
It is hard to see why such a tailoring of the results of each case to its facts is not to be preferred to the erection of rigid classifications, be they catalogued as "trespasser”, "licensee” or "business visitor” (see Basso and Scurti, supra), as "grossly” or "ordinarily” negligent or as "supervising parent”. Looking to the entire picture, rather than merely the labels, is the surer path to a just result.

 (See Badigian, 9 NY2d, at pp 476-81; Gelbman, 23 NY2d, at pp 437-439; for an excellent discussion of these concerns see Note, 47 U Col L Rev 795.)